# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| Bobby Grant, Jr., as Personal Representative of the Estate of Bobby Grant, Sr. and as Representative of Statutory Beneficiaries, | C/A No. 3:17-cv-0377-CMC |
| Plaintiff, | |
| v. | Opinion and Order<br>Denying Motion to Dismiss<br>or for Summary Judgment |
| United States of America, | |
| Defendant. | |

Through this action, Bobby Grant, Jr. ("Plaintiff"), acting as personal representative of the estate of Bobby Grant, Sr. ("Decedent") and as representative of Decedent's statutory beneficiaries, seeks recovery from the United States of America ("Government") for alleged medical malpractice. Plaintiff's claims arise out of medical treatment Decedent received at the William Jennings Bryan Dorn Veterans Administration Medical Center ("Dorn VAMC") and focus on allegations Decedent's primary care physician violated the applicable standard of care resulting in a failure to timely diagnose Decedent's prostate cancer. Plaintiff proceeds under the Federal Tort Claims Act, 28 U.S.C. § 2671 to § 2680 ("FTCA") and incorporated state law governing wrongful death and survival claims.

The matter is before the court on the Government's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56. ECF No. 8. The Government argues Plaintiff's claims are barred by the FTCA's two-year statute of limitations. This argument depends on the assumption the claims accrued no later than August 29, 2012, more than two years before Plaintiff filed an FTCA administrative claim ("FTCA Claim") in March 2015. *See* ECF No. 8-1 at 10; *but see infra* Discussion § I.B. (noting

Government's varied positions as to dates relevant to accrual). Plaintiff responds Decedent could not have been on notice of his claim prior to April or July 2013, when he was diagnosed with prostate cancer, as the critical issue is not simply when he learned he had cancer but when he was on notice of his physician's failure to timely diagnose the disease. [1] *See* ECF No. 15 at 6; *see also* ECF No. 1 ¶¶ 20, 21 (alleging Decedent was notified of his extremely elevated PSA levels on April 18, 2013, and diagnosed with Stage IV prostate cancer on July 23, 2013); ECF No. 8-2 at 11 (FTCA Claim characterizing April 18, 2013 as the "date of discovery" and date of diagnosis).

The Government also argues the claims are precluded because Plaintiff failed to satisfy pre-suit filing requirements imposed by S.C. Code § 15-79-125. Plaintiff responds this statute, which applies to claims for medical malpractice, is superseded by or in conflict with the FTCA's administrative proceeding requirements.

For reasons set out below, the motion is denied. The court, nonetheless, invites additional briefing on whether Section 15-79-125 applies to claims pursued under the FTCA and will consider staying this action to allow such proceedings as explained in Discussion § II.

## BACKGROUND

**Complaint.**[2] The Complaint alleges Decedent was a patient at Dorn VAMC during the period February 24, 2009, to June 18, 2013. ECF No. 1 ¶ 13 (filed February 8, 2017). During this

---

[1] Whether Decedent was diagnosed in April or July 2013 makes little difference as both are within the two-year period preceding filing of the FTCA Claim. Thus, if the claim accrued on or after the date of diagnosis, the FTCA Claim was timely using either diagnosis date.

[2] To the extent the Government seeks dismissal under Rule 12(b)(6) of the Federal Rules of Procedure, the court accepts the allegations of the Complaint as true and construes those allegations in the light most favorable to Plaintiff. *See*, *e.g.*, *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). The court need not, however, accept unwarranted inferences or legal

time, Dr. Naumann, an agent or employee of Dorn VAMC, served as Plaintiff's primary care physician. *Id.* ¶¶ 12, 13. In 2007, 2008, and 2009, Dr. Naumann ordered blood tests, which revealed elevated levels of prostate specific antigen ("PSA").[3] *Id.* ¶¶ 14, 15. Despite these elevated levels, blood tests were not performed in 2010 or 2011. ECF No. 1 ¶ 16. A blood test performed in June 2012 revealed a PSA level of 124.71 that the Complaint describes as "extremely indicative of some disease process in the body." *Id.* ¶ 17. Plaintiff alleges Decedent's physician failed to "follow up with an adequate evaluation" following receipt of the June 2012 test, though he "should have realized [the] abnormal test results warranted further follow up in a timely manner." *Id.* ¶ 17, 18.

Decedent's PSA level was checked again in April 2013, revealing a PSA level of 796.53. *Id.* ¶¶ 19, 20. Decedent was notified of the high PSA level and, after seeing a urologist, was "diagnosed with widely metastatic adenocarcinoma of the prostate" in July 2013. *Id.* ¶¶ 19-21. He "died on August 7, 2013, as a result of prostate cancer with metastatic disease." *Id.* ¶ 22. Plaintiff alleges Decedent would have had a "more favorable outcome" had his elevated PSA levels been properly investigated in 2007, 2008, 2009, or 2012, or properly monitored and investigated in 2010 and 2011. *Id.* ¶ 23.

---

conclusions drawn from the facts. *Id.* The court may also consider materials attached or incorporated into the complaint by reference as well as matter of which the court may take judicial notice. *See*, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551, U.S. 308, 322 (2007); *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).

[3] The PSA levels in this order refer to nanograms/milliliter ("ng/mL"). For ease of reference, the court refers to the number only, without the ng/mL designation.

**Expert Affidavit.** The Complaint relies on an expert affidavit to support the alleged breaches of the applicable standard of care. ECF No. 1 ¶ 24.[4] This affidavit opines that actions or inactions by Dr. Naumann or other agents or employees of Defendant contributed to Decedent's injuries (and death) by delaying diagnosis and treatment until Decedent's cancer had progressed to Stage IV. ECF No. 6 ¶ 5. Specific errors include a failure to investigate the rise in Decedent's PSA level between the February 2008 and February 2009 blood tests (*id.* ¶ 5.a.), failure to recheck PSA levels despite that rise and four subsequent office visits between July 2009 and August 2011 (*id.* ¶ 5.b), and failure to take action to ensure Decedent followed up with a specialist after his June 2012 test revealed a PSA level of 124.7 (*id.* ¶ 5.c. (noting this "very high number" indicated "almost certain prostate cancer")).[5]

**FTCA Claim.**[6] In addition to the Complaint and Expert Affidavit filed by Plaintiff, the Government relies on records of Plaintiff's pre-suit FTCA Claim. These records include the claim

---

[4] Though referred to as contemporaneously filed, the affidavit was actually filed roughly a week after the Complaint. ECF No. 6 (filed February 15, 2017). It is, nonetheless, deemed incorporated into the Complaint for purposes of the Government's motion given the Complaint's express reference to the expert affidavit.

[5] The expert's affidavit states Decedent's PSA level was 4.9 in February 2008 and 6.51 in February 2009. *See* ECF No. 6 ¶ 5.a. It asserts Decedent's physician failed to recheck his PSA level during office visits in July 2009, February 2010, February 2011, and August 2011. *Id.* ¶ 6. These averments are consistent with medical records filed in support of the Government's motion which include a consultation sheet from June 2012, reporting PSA results from February 2007 (4.090), February 2008 (4.897), February 2009 (6.508), and June 2012 (124.706). No PSA results are listed for the period between February 2009 and June 2012.

[6] The FTCA Claim and related documents were submitted by the Government. Plaintiff submitted two additional documents with his opposition memorandum: a request for reconsideration of denial of the FTCA Claim; and a document titled "Institutional Disclosure of Adverse Event," which was submitted to the VA with the request for reconsideration. Neither party addresses

form (SF 95) and continuation pages, attached medical records, and related correspondence. ECF No. 8-2 (FTCA Claim dated March 20, 2015, and stamped received by the Veteran's Administration ("VA") on March 30, 2015); ECF No. 8-3 (supplement to FTCA Claim dated June 1, 2015, and stamped received by the VA on June 15, 2015); ECF No. 8-4 (denial letter). The continuation pages describe the nature, date and time of the event giving rise to the claim as "substandard medical care . . . starting as early as 2008 and continuing until April 18, 2013, date of discovery, when Mr. Grant was diagnosed with Stage IV metastatic prostate cancer." ECF No. 8-2 at 11. They reflect Decedent's PSA level was 4.09 in February 2007, 4.90 in February 2008, 6.51 in February 2009, and 124.71 in June 2012. ECF No. 8-2 at 12, 13 (noting the "normal" range is from 1.0 to 4.0, though some physicians adjust for age).

The continuation pages note Dr. Naumann first performed a digital rectal exam ("DRE") in June 2012, after a blood test revealed extremely high PSA levels, reported the results of the DRE as "Prostate hard; nodule on right," and made a urology referral following that examination. *Id.* at 13. The continuation pages assert the urology referral was not placed on an urgent basis and, consequently, was not scheduled until August 2012. *Id.* By that time, Decedent was hospitalized for an aortic stent to address an aneurysm. *Id.* The continuation pages state Decedent cancelled the August appointment as a result of his hospitalization.[7]

---

whether these documents may be considered in the context of a motion to dismiss or only to the extent the Government's motion is treated as a motion for summary judgment.

[7] Additional medical records submitted by the Government (as well as a declaration of a nurse practitioner involved in scheduling) indicate a somewhat different sequence of events including that the urology consult was initially scheduled for July 30, 2012, was cancelled by Decedent and rescheduled for mid-September 2012, then cancelled by Decedent again in late August due, in part, to a recent surgery. *See infra* Jenner Declaration.

The continuation pages state Dr. Naumann "apparently realized" during Decedent's April 2013 visit that Decedent had not been seen by a urologist following his June 2012 appointment and, again made a urology referral, this time on an urgent basis. *Id.* at 14. By the time Decedent was seen for this consultation on April 18, 2013, his PSA level was 796.53. *Id.*

These pages paraphrase notes by nurse practitioner Dianne Jenner ("Jenner"), made at or around the time of the April 2013 referral, as stating Decedent cancelled his last appointment "as [he] was hospitalized locally then for AAA stenting in Charlotte. Patient adamantly denies any mention of Pca (prostate cancer) history[.]" *Id.* The continuation pages state Decedent was diagnosed with prostate cancer in late April 2013 following a biopsy on April 22, 2013, and died as a result of his prostate cancer in August 2013.

The FTCA Claim alleges Dorn VAMC and its agents were negligent in failing to diagnose Decedent's cancer in a timely manner. It relies, in part, on VA standards that recommend yearly PSA tests and DRE for veterans over the age of 50 who request screening. *Id.* at 15. The claim asserts Decedent requested screening as evidenced by the years in which PSA levels were checked (2007, 2008, 2009, and 2012). It argues Dr. Naumann violated the standard of care by (1) not performing a DRE before accepting the PSA levels in 2008 and 2009 as within a reasonable range based on adjustment for age, (2) failing to request an urgent urology referral in June 2012, and (3) failing to ensure Decedent followed through with the urology referral that was made.

**Medical Records Attached to FTCA Claim.** Various medical records were attached to the FTCA Claim. Records from February 2008 and March 2009 indicate Dr. Naumann informed Decedent by letter of the results of his blood work, including PSA levels, for both years' tests. ECF No. 8-2 at 26, 33 (reflecting content of letters). Both letters described the PSA levels as "a bit high" but normal when adjusted for age. *Id.*

6

A record of Decedent's June 2012 visit with Dr. Naumann reports a PSA score "over 120," a "urology referral," and abnormal results from a DRE. *Id.* at 37, 38, 41. Unlike the records for 2008 and 2009, the record of this visit does not indicate a letter was sent to Decedent advising him of these results or their import.

A record of Decedent's April 9, 2013 visit with Dr. Naumann includes the following under Assessment/Plan: "Elevated psa: check psa, then urology referral."[8] Records indicate this urology consultation was completed on April 18, 2013. *See id.* at 54 (report of April 18, 2013 PSA testing, ultrasound and biopsy). In her notes relating to this consultation, Jenner described Decedent as 79 years old with "poor memory and thus poor historian" and states he was "referred for markedly elevated PSA near 800 now." *Id.* at 50. The notes refer to Decedent's June 2012 PSA as being "above 100" and explain Decedent "cancelled [an earlier referral] appointment as [he] was hospitalized locally then for AAA stenting in Charlotte." *Id.* The notes then state "*[Patient] adamantly denies any mention of Pca hx even though he states he was seen by local urologist 2 [months] ago* and had cysto for LUTS. He brings no outside records and [h]is knowledge of his condition is very limited." *Id.* (emphasis added). Jenner's notes report a DRE performed as part of this consultation revealed "markedly enlarged indurated multinodular prostate." *Id.* at 50, 51 (also stating patient was interested in diagnosis and treatment). Jenner added a note on April 25, 2013, stating "after multiple phone calls to Pineville doctor['s] office it was determined that [patient] was seen by vascular specialist and not a urologist." *Id.* at 52.

_____

[8] It appears the April 9, 2013 notation refers to the elevated PSA results from testing done in June 2012, as the only record of a blood test done in or around April 2013 was after this notation was made. *See* ECF No. 8-2 at 54 (record of April 18, 2013 PSA test); ECF No. 8-7 at 1 (June 28, 2012 referral listing PSA results from June 22, 2012, as well as results from 2007, 2008, and 2009).

Records indicate a July 23, 2013 radiology consultation at McLeod Regional Medical Center confirmed "multiple areas of metastatic disease." *Id.* at 57-59. The consultation letter sent to the Dorn VAMC notes Decedent's PSA went from "4.79 in 2008 to 349 presently" and that he had "obvious Stage IV disease" at the time of consultation. *Id.* at 59.

**Supplement to FTCA Claim.** The Government also attaches a June 2015 supplement to the FTCA Claim. ECF No. 8-3 at 1 (letter dated June 10, 2015, and stamped received on June 15, 2015). The cover letter to this supplement asserted, inter alia, that it was inappropriate to adjust the "normal" PSA range upward without performing either a DRE or transrectal ultrasound. *Id.* The claim form and attached documents appear to be mostly if not entirely duplicative of the original claim form and attachments. The cover letter, however, adds reference to a May 14, 2015 meeting between Decedent's son (Plaintiff), daughter, and the Dorn VAMC Chief of Staff. It states claimants have requested but not yet received a record of that meeting. *Id.*; *see also infra* Institutional Disclosure of Adverse Event (record of meeting).

**Denial of Claim.** The Government denied the FTCA Claim by letter dated November 4, 2015, stating "[b]ecause the alleged negligence here occurred in 2008, this claim is untimely under South Carolina's [six-year] statute of repose." ECF No. 8-4 at 1.[9] The denial letter also relied on

---

[9] The denial letter noted but did not rely on the FTCA's two-year statute of limitations. The Government now relies only on the two-year statute of limitations rather than the statute of repose, and on an August 29, 2012 accrual date rather than an assumption the last alleged negligent act was in 2008.

the unavailability of a loss of consortium claim under South Carolina law for a child's loss of a parent.[10]  *See also infra* Request for Reconsideration.

      **Jenner Declaration.**  In addition to the administrative claim and attached medical records, the Government relies on a declaration by Jenner.  While not so limited, the focus of Jenner's declaration is on events surrounding cancellation of the urology consultation following Dr. Naumann's June 2012 referral:

> 5.      On June 28, 2012, I received [a] request for a urological consult for Bobby Grant, Sr. by Eric Paul Naumann, M.D.  . . . As can be seen from Exhibit A, on June 28, 2012, I directed . . . Mr. Grant to be schedule[d] for our clinic within thirty days.  As a result, Mr. Gra[nt] was scheduled [for] an appointment on July 30, 2012; however, Mr. Grant telephonically cancel[l]ed that appointment on July 18, 2012. Nevertheless, during that telephone call, Mr. Grant's appointment was rescheduled to September 17, 2012.[[11]]

> 6.      On August 29, 2012, Mr. Grant and I had a conversation in which he called to cancel his September 17, 2012 appointment.  Although I do not remember the specifics of the conversation, I was able to discern that Mr. Grant had a recent abdominal aortic aneurysm, which required surgery.  He also indicated that he developed an inability to urinate (acute urinary retention), and as a result he had an indwelling foley catheter.

> 7.      During our conversation on August 29, 2012, I reviewed his medical records, including but not limited to[] his PSA test results, including the most recent result from June 22, 2012 of 124.706 and that a digital rectal exam (DRE) was performed by Dr. Naumann on August 28, 2012[[12]], which revealed a "hard prostate; nodule towards right."  I was also aware that this was his second requested cancellation for his urological consultation.  Given my experience and training as a nurse practitioner in the Urology Department, I was aware that these findings were

---

[10]  The denial letter incorrectly identified the VA facility at issue as a facility in Georgia rather than Dorn VAMC.

[11]  The record does not indicate whether Decedent gave a reason for cancelling his July 30, 2012 urology consultation.

[12]  The August 28, 2012 date appears to be incorrect.  Contemporaneous medical records indicate the DRE was performed on or before June 28, 2012.  *See* ECF No. 8-2 at 41; ECF No. 8-7 at 1.

> indicative of prostate cancer. *Based upon the foregoing, I stressed to Mr. Grant the need for him to see a urologist due to his significantly elevated PSA results. I also made it very clear to Mr. Grant that there were serious concerns that he had prostate cancer.* Mr. Grant indicated that he had plans to follow up with a local urologist that was involved in the management of his recent surgery. It was only after he assured me that he would follow up with a urologist that I cancelled his scheduled appointment for September 17, 2012.

ECF No. 8-6 (emphasis added).

Attached medical records reflect Decedent was initially scheduled for a July 30, 2012 urology appointment (roughly one month after the referral was made) and cancelled that appointment (speaking with someone other than Jenner), rescheduling it for September 17, 2012. *Id.* These records also indicate Decedent spoke with Jenner in August 2012, when he called to cancel the September appointment. *Id.* (referring to stated reason as recent hospitalization).

Jenner's note of the call on August 29, 2012 reads as follows: "pt called to cancel 9-17 Dorn gu appt. [D]eveloped acute urinary retention s/p recent AAA and has indwelling foley. [P]lans f/u with local urologist for mgmt. due to recent surgery." ECF No. 807 at 3 (note entered August 29, 2012).[13]

**Institutional Disclosure of Adverse Event.** In responding to the Government's motion, Plaintiff submits two additional items of evidence not provided by the Government, an Institutional Disclosure of Adverse Event ("Adverse Event Disclosure") dated May 14, 2015, and a letter requesting reconsideration of the denial of the FTCA Claim dated April 29, 2016. The Adverse Event Disclosure appears to be the record of Plaintiff's May 14, 2015 meeting with the Dorn

---

[13] Jenner's note of her August 29, 2012 conversation with Decedent does not mention his PSA levels or DRE results. Neither does it mention her warning there were serious concerns he had prostate cancer.

VAMC Chief of Staff, Bernard L. DeKoning M.D., which was referenced in his counsel's June 10, 2015 cover letter (providing supplement to the FTCA Claim). The Adverse Event Disclosure states, inter alia:

> Dr. DeKoning expressed condolences to the family and explained the events that occurred, particularly with the primary care provider. *He apologized for lack of follow-through on the elevated PSA in the 2009-12 time frame and how this did not meet [the] standard of care.*
>
>           \* \* \*
>
> Family asked why it took 8 months to reschedule a urology appointment after the patient's surgery for abdominal aortic aneurysm in 2012. Dr. DeKoning indicated it was not clear from the records why an 8 month delay occurred.
>
> Advisement of 1151 claims process and right to file administrative tort claim: Family has already filed a tort claim.

ECF No. 15-1 (emphasis added).

**Request for Reconsideration.** Plaintiff also relies on a letter requesting reconsideration of the denial of the FTCA Claim. ECF No. 15-2. This letter attached the Adverse Event Disclosure quoted above as well as previously submitted claim documents. *Id.* at 2.

The letter addresses the two grounds relied on for denial. As to South Carolina's statute of repose, it concedes Decedent's estate "may not sue for any negligence that occurred in 2008 or 2009" but explains the estate is seeking relief for the continued negligence when Decedent "saw his doctor in 2010, 2011, and 2012," which would not be barred by the statute of repose. *Id.* at 1. The letter also relies on South Carolina's continuous accrual doctrine, explaining this doctrine applies to both statutes of repose and statutes of limitation. *Id.* at 1, 2. The letter also explains why the non-availability of a loss of consortium claim is not fatal to recovery as Decedent's children may pursue recover under a wrongful death theory. *Id.* at 2. Both the Complaint and response to the Government's motion indicate there was no response to this request for reconsideration. ECF No. 1 ¶ 7 (noting absence of response during the "six month period during

11

which the right to file suit was suspended"); ECF No. 15 at 2 (noting Government "failed to act" on request for reconsideration).

## DISCUSSION

## I.     Statute of Limitations Argument

### A.     Standard

The Government's statute of limitations argument is addressed under the standard applicable to motions for summary judgment because it depends on matters outside the pleadings. *See generally* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or (c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").[14]  That standard allows entry of summary judgment "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *see also* Fed. R. Civ. P. 56(a) (summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

### B.     Date of Accrual

The Government has taken a number of arguably inconsistent positions relating to the date of accrual.  In the May 14, 2015 Adverse Event Disclosure, Dorn VAMC's Chief of Staff

---

[14]  While the motion is captioned as one seeking summary judgment in the alternative to dismissal, the Government relies solely on the standard applicable to motions to dismiss for failure to state a claim.  *See* ECF No. 8 at 5, 6.

acknowledged Decedent's "primary care provider" failed to meet the standard of care by failing to "follow-through on [Decedent's] elevated PAS in the 2009-2012 time frame." ECF No. 15-1. This document also notes the records were "not clear" as to why there was an eight month delay in rescheduling a urology appointment *after* Decedent's 2012 surgery for abdominal aortic aneurysm. Read in the context of other records, which reveal the referenced surgery (and cancellation) occurred in or around August 2012, this document might evidence an ongoing failure to meet the standard of care until April 2013, a date less than two years before the FTCA Claim was filed.

Despite having been alerted to the meeting discussed in the Adverse Event Disclosure and claiming to have "thoroughly investigated the facts and circumstances," the VA denied the FTCA Claim in November 2015 based, in part, on an assumption "the alleged negligence [at issue] occurred in 2008." ECF No. 8-4 at 1 (relying on South Carolina's six-year statute of repose). The VA did not respond to Plaintiff's request for reconsideration, which attached the Adverse Event Disclosure and noted the alleged negligence continued into 2012.

In its present motion, the Government argues the claim accrued no later than August 29, 2012, when Decedent called to cancel his already once-rescheduled urology consultation. This argument rests on Jenner's Declaration regarding her statements to Decedent during that call. Thus, rather than relying on an assumption the last negligent act occurred in 2008, the Government now relies on an argument Decedent was placed on notice of his failure to diagnose claim by an August 2012 phone conversation in which he was allegedly given notice of a likely diagnosis of cancer.

While the Government's prior statements relating to the dates of the alleged negligent acts do not foreclose its current arguments, they at least raise concerns weighing against summary

judgment.  Most critically, the Adverse Event Disclosure acknowledges a failure to meet the standard of care "in the 2009-2012 time frame" and arguably indicates that failure (and continuous care by Dr. Naumann) continued until Decedent was seen by a urologist in April 2013, a date within two years of Plaintiff's FTCA Claim.

## C.  Reliance on Jenner's Declaration

As noted above, the Government's present argument rests on Jenner's Declaration regarding her August 29, 2012 telephone conversation with Decedent.  ECF No. 8-1 at 10; ECF No. 16 at 2, 4.[15]  This Declaration provides the *only* direct support for the premise Decedent was informed on August 29, 2012, of the results of his June 2012 PSA test and DRE and that there were serious concerns he had prostate cancer.  Certainly that premise is not supported by Jenner's contemporaneous notes of the August 29, 2012 conversation, which make no mention of Decedent's PSA levels, DRE results, or any expression of concern regarding a probable cancer diagnosis.[16]  Jenner's contemporaneous record of her subsequent April 2013 consultation, which

_____

[15]  The Government's opening memorandum refers to a telephone conversation between Jenner and Decedent on "September 29, 2012."  ECF No. 8 at 10 (citing Jenner Declaration as a whole); s*ee also* ECF No. 15 at 5, 6 (Plaintiff's response also referring to claimed conversation in September 2012).  As Jenner does not refer to any conversation in September 2012, the court assumes the references are to Jenner's Declaration regarding an August 29, 2012 telephone conversation cancelling Decedent's September 17, 2012 appointment.  *See* Jenner Declaration ¶ 6.  This assumption is also consistent with the Government's reply which relies on Jenner's Declaration in stating "[t]here is no question that . . . *on August 29, 2012*, the Decedent knew that he had an injury as Jenner stressed to him the seriousness of his significantly elevated PSA results, warned him of the concerns that he had prostate cancer, and received assurance from him that he would follow up with his local urologist."  ECF No. 16 at 2 (emphasis added).

[16]  Jenner's contemporaneous notes of her August 2012 conversation with Decedent state he called to cancel because he had "developed acute urinary retention s/p recent AAA and has indwelling foley.  [P]lans f/u with local urologist for mgmt due to recent surgery."  *See* ECF No. 8-7 at 3. Nothing in this note indicates Jenner discussed Decedent's high PSA score and abnormal DRE

noted Decedent's denial of any mention of prostate cancer history, may also weigh against her present recollection of the August 2012 conversation. ECF No. 8-2 at 50 (stating Decedent "adamantly denie[d] any mention of Pca hx even though he states he was seen by local urologist 2 [months] ago and had cysto for LUTS" and failing to mention any prior conversation in which Jenner discussed probability of cancer diagnosis with Decedent).

Jenner's August 29, 2012 conversation with Decedent occurred over four years prior to the date of her Declaration. Jenner concedes she "do[es] not remember the specifics of [that] conversation" though she states she "was able to discern" certain facts and purports to recall other details including that she "stressed . . . the need for [Decedent] to see a urologist" and "made it very clear . . . that there were serious concerns that he had prostate cancer." ECF No. 8-6 ¶¶ 6, 7. At the least, Plaintiff should have the opportunity to depose Jenner on these assertions before the matter is resolved, given the Government's complete reliance on Jenner's recollection of a conversation with an individual whose testimony is no longer available.[17]

---

with him or warned him of the likelihood of a cancer diagnosis. Neither does it suggest Decedent's stated intent to follow up with the local urologist related to a potential cancer diagnosis as opposed to "management" of his recent post-surgical complications. The records do not, moreover, reflect any plan to forward Decedent's PSA and DRE results to his local urologist as might be expected if follow up with the local urologist was intended as a substitute for Dr. Naumann's referral to a urologist at Dorn VAMC.

[17] Without Jenner's Declaration, there may be no direct evidence Decedent was informed of his extremely elevated PSA levels or DRE results from June 2012, or their import, especially prior to April 2013. It is of some note here that, in contrast to evidence Dr. Naumann wrote Decedent in 2008 and 2009 reporting and explaining Decedent's PSA results, no evidence has been offered of a similar letter in 2012. While Decedent clearly was aware of the urology referral, it is unclear from the present record what he was told regarding the reason for the referral.

Even if Jenner's recollection of the conversation is accepted as true, more than one reasonable inference may be drawn as to whether it provided Decedent notice of his claim. This is because the issue is not simply whether Decedent was on notice in August 2012 (or any time prior to April 2013) that his PSA level and DRE showed a strong likelihood of prostate cancer and, consequently, a need for follow up with a urologist (the premises supported by Jenner's Declaration). Rather, the issue is whether the information Jenner provided placed Decedent on notice his primary care physician had failed to adequately monitor his PSA levels and, as appropriate, perform DREs and ensure follow through on a referral in the second half of 2012.

In sum, when Decedent first learned of his high PSA levels and abnormal DRE from June 2012 and whether that information was enough to put him on notice of a potential failure to diagnose claim is not so clear as to support summary judgment. This is particularly true in light of the potential application of the continuous care doctrine. *See Holland v. United States*, 302 F. Supp. 2d 484, 488 (M.D.N.C. 2004) (discussing doctrine but finding it did not apply).[18]

---

[18] Both sides refer to but do not fully brief the potential applicability of this rule. The court does not, therefore, decide whether or under what circumstances the doctrine might apply but notes the Fourth Circuit has defined the doctrine as follows:

> The continuous treatment doctrine is based on a patient's right to place trust and confidence in his physician. Under the doctrine, the patient is excused from challenging the quality of care being rendered until the confidential relationship terminates. Stated another way, the doctrine permits a wronged patient to benefit from his physician's corrective efforts without the disruption of a malpractice action.

*Otto v. National Institute of Health*, 815 F.2d 985, 988 (4th Cir. 1987) (citations omitted) (also noting "where there has been a course of continuous medical treatment, a claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose.").

Accordingly, the court denies the Government's motion without prejudice to renewal following completion of discovery.

## II. South Carolina Prerequisites to Suit

The Government also seeks dismissal based on Plaintiff's failure to comply with the prerequisites to a medical malpractice action imposed by S.C. Code Ann. § 15-79-125. ECF No. 8-1 at 11. Specifically, the Government argues the action should be dismissed because Plaintiff failed to comply with the requirement to file a pre-suit notice of intent to file suit together with an affidavit.

The Government concedes Plaintiff filed an expert affidavit *with the Complaint*, a requirement imposed on certain professional negligence claims by S.C. Code Ann. § 15-36-100. It does not challenge the sufficiency of that affidavit to comply with the requirements of Section 15-36-100.[19]

---

[19] Both Sections 15-36-100 and 15-79-125 require plaintiffs to file an expert affidavit and both require the same content as Section 15-79-125 incorporates the affidavit requirements from Section 15-36-100. The key distinction is the timing of the required filing. Section 15-79-125, which applies to medical malpractice claims, requires plaintiffs to file an expert affidavit as one of several *pre-suit* requirements. Section 15-36-100, which applies to a broader range of professional negligence claims, requires plaintiffs to file an expert affidavit *with the complaint*. S.C. Code Ann. § 15-36-100(B). The affidavit requirement in Section 15-36-100 is prefaced with the language "[e]xcept as provided in Section 15-79-125," suggesting the requirement to file an affidavit *with* the complaint is not applicable to medical malpractice actions covered by Section 15-79-125 (presumably because it would be duplicative of pre-suit requirements). The intent of the exception is not, however, entirely clear as the categories of professional listed in Section 15-36-100 include a number of medical professionals including dentists, medical doctors, nurses, and physician's assistants. S.C. Code Ann. § 15-36-100(G)(5), (7), (9), (15). One potential reconciliation is the expert witness requirement in Section 15-36-100 survives as to any medical malpractice action to which Section 15-79-125 is found inapplicable or unenforceable, as may be the case here for reasons discussed below. Ultimately, this court need not decide in this action which, if either, state law provision requires a medical malpractice plaintiff to file an expert affidavit *with the complaint* because Plaintiff satisfied any such requirement.

Section 15-79-125 applies to "civil action[s] alleging injury or death as a result of medical malpractice." It imposes an obligation on plaintiffs, before the action is initiated, to "contemporaneously file a Notice of Intent to File Suit and an affidavit of an expert witness, subject to the affidavit requirements established in Section 15-36-100, in a county in which venue would be proper for filing or initiating the civil action." S.C. Code Ann. § 15-79-125. This pre-suit filing is followed by pre-suit discovery and mediation. S.C. Code Ann. § 15-79-125(B), (C). If mediation fails, litigation may then commence "pursuant to the South Carolina Rules of Civil Procedure." S.C. Code Ann. § 15-79-125(E). Jurisdiction over the proceedings envisioned by Section 15-79-125 is vested in the state's circuit courts. S.C. Code Ann. § 15-79-125(D).

Thus, the Government's argument is, in essence, that, in addition to pursuing an administrative claim before the VA, Plaintiff was required to comply with Section 15-79-125's pre-suit filing, discovery and mediation requirements. Four premises are inherent in this argument: (1) Section 15-79-125 is part of the substantive law of the state; (2) the pre-suit filing requirements of Section 15-79-125 are not superseded by or in conflict with the FTCA's administrative claim requirement; (3) the Government is either subject to or has consented to state jurisdiction for purposes of proceedings under Section 15-79-125; and (4) Plaintiff was on notice of that jurisdiction or consent.[20]

---

[20] A possible alternative to the second and third premises would be that these pre-suit proceedings would be pursued under the jurisdiction of the federal court. This court is, however, aware of no rule or precedent authorizing such proceedings in this court.

For reasons set out below, the first premise is supported by case law and, indeed, conceded by Plaintiff. [21] The remaining premises are either not supported or subject to such substantial doubt as to preclude dismissal for failure to comply with any pre-suit requirements (other than, potentially, the requirement to file an expert affidavit with the complaint as was done in this case) that may otherwise apply.

Multiple judges within this district, including the undersigned, have held Section 15-79-125 and Section 15-36-100 are part of the substantive law of South Carolina and, consequently, apply to actions filed in federal court. For example, in *Millmine v. Harris*, C.A. No. 3:10-CV-1595-CMC, 2011 WL 317643 (D.S.C. 2011), this court held Section 15-79-125's pre-suit filing requirements applied to a *state law medical negligence claim* against an entity that provided care in a county detention center. Similarly, in *Rotureau v. Chaplin*, CA. No. 2:09–CV–1388–DCN, 2009 WL 5195968 at * 6 (D.S.C. 2009), the court held Section 15-36-100's affidavit requirement was applicable to a *state-law legal malpractice claim* filed in federal court. Neither case involved a claim under the FTCA.

At least two decisions from this district have addressed Section 15-79-125 in the context of an FTCA claim. *Chappie v. United States*, C.A. No. 8:13-cv-1790-RMG-JDA, 2014 WL 3615384 (D.S.C. 2014); *Jelks v. United States,* 3:12–3451–JFA–PJG, 2014 WL 1096301 (D.S.C. 2014). While both decisions held Section 15-79-125 applied to an FTCA claim, they did not address the pre-suit filing requirements of that Section. Instead, they addressed a requirement

---

[21] Plaintiff concedes Section 15-79-125 constitutes substantive law of the state. Plaintiff, nonetheless, argues South Carolina's pre-suit notice requirement does not bar the claim because it is "preempted by the Federal Tort Claims Act's administrative claim process and by the Federal Rules of Civil Procedure." ECF No. 15 at 1.

plaintiff file an expert affidavit *with the complaint.* As explained above, this is a requirement of Section 15-36-100, not a requirement of Section 15-79-125. *Supra* n. 19.[22]

Because neither of these cases considered any requirement other than the duty to file an affidavit *with the complaint*, they did not address the potential issues raised by imposing a pre-suit requirement that at least partially duplicates and arguably conflicts with the FTCA's requirement for filing an administrative claim. The cases also failed to raise jurisdictional concerns given they only addressed filing of an affidavit *in federal court with the federal court complaint.*

In contrast, the *pre-suit* requirements the Government argues were required to be pursued in this action are requirements to file a pre-suit notice and participate in discovery and mediation. These proceedings at least partially duplicate the administrative claim requirement of the FTCA. They would also, presumably, all be under control of the state court as there is no corresponding proceeding available in this court. Thus, the Government appears to argue that Plaintiff should have initiated pre-suit proceedings in which the Government could well have refused to participate. The court is aware of no decision addressing these concerns, much less dismissing an FTCA claim for medical malpractice for failing to comply with Section 15-79-125's *pre-suit* requirements (as

---

[22] In *Chappie*, the court adopted a magistrate judge's recommendation that *summary judgment* be granted on a pro se FTCA claim for medical malpractice on multiple grounds including failure to adduce evidence in support of the claim and failure to comply with "South Carolina's expert affidavit requirement[.]" 2014 WL 3615384 at * 1 (citing both Sections 15-36-100 and 15-79-125). In *Jelks*, the court adopted a magistrate judge's recommendation that an FTCA claim be dismissed because the pro se plaintiff failed to file an expert affidavit with his complaint or to cure the deficiency through a later-filed affidavit. 2014 WL 1096301 at *1 n.4 (order), *4 (report and recommendation). The magistrate judge referred to Section 15-79-125's *pre-suit* filing requirements, but relied only on the absence of an adequate affidavit filed *with* (or even after) the complaint. *Id.* at *3, 4 (also citing Section 15-36-100).

opposed to an obligation to file an expert affidavit *with* the complaint, which may arise under Section 15-36-100 or, possibly, under some interpretation of Section 15-79-125).[23]

Under these circumstances, the court will not dismiss the action for failure to comply with Section 15-79-125's pre-suit requirements because Plaintiff could not reasonably have predicted the Government would not only consent to state-court jurisdiction for such proceedings but insist they are a prerequisite to suit. The court, nonetheless, seeks additional input from the Government and will stay this action while Section 15-79-125 proceedings (or voluntary discovery and mediation) are pursued if the Government indicates its consent (or non-objection) to proceedings under that provision of state law.

Wherefore, the Government is directed to respond to the following inquiries within fourteen days of entry of this order:

1. Does the Government maintain that the proceedings envisioned by S.C. Code Ann. § 15-79-125 are (a) not duplicative of or superseded by the administrative proceedings required as a prerequisite to an action under the FTCA and (b) should be required as a prerequisite to pursuing an FTCA claim for medical malpractice for claims arising in South Carolina?

2. Does the Government either concede it is subject to the jurisdiction of the state court or consent to that jurisdiction for purposes of pre-suit proceedings under S.C. Code Ann. § 15-79-125?

---

[23] As noted above, the requirement to file an expert affidavit *with* the complaint is found only in Section 15-36-100, which section has language arguably excluding medical malpractice claims from the scope of this requirement. While Section 15-79-125 requires filing of an expert affidavit, it is as part of a *pre-suit proceeding*.

3.      If the Government maintains plaintiffs in FTCA actions for medical malpractice should be required to comply with the pre-suit proceedings envisioned by S.C. Code Ann. § 15-79-125 in addition to compliance with the administrative claim proceedings under the FTCA, but those pre-suit proceedings should occur under the jurisdiction of the federal court, it should identify the rules or authority under which such pre-suit procedures would be conducted.

If the Government's response to these inquiries indicates an intent to require compliance with and agree to participate in Section 15-79-125's pre-suit requirements, Plaintiff may file a reply within seven days thereafter.  If the Government persuades the court that Section 15-79-125 should be applied or if the parties otherwise agree to a stay in order to engage in mediation (either as envisioned by Section 15-79-125 or voluntarily), the court will stay this action for a reasonable period of time to allow completion of such proceedings.

## CONCLUSION

For reasons set out above, the Government's motion to dismiss for failure to state a claim or, in the alternative for summary judgment is denied.  The Government is, however, directed to respond to additional queries set out above within fourteen days of entry of this order.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
May 24, 2017